**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Micki Lynn Baldwin, | CIV-13-01621-PHX-MHB |
| Plaintiff, | **ORDER** |
| vs. | |
| Carolyn W. Colvin, Commissioner of the Social Security Administration, | |
| Defendant. | |

Pending before the Court is Plaintiff Micki Baldwin's appeal from the Social Security Administration's final decision to deny her claim for disability insurance benefits. After reviewing the administrative record and the arguments of the parties, the Court now issues the following ruling.

**I. PROCEDURAL HISTORY**

On September 11, 2009, Plaintiff filed an application for a period of disability and disability insurance benefits alleging disability beginning February 20, 2009. (Transcript of Administrative Record ("Tr.") at 12, 141.) Plaintiff's claims were denied initially and on reconsideration. (Tr. at 64-79, 82-84.) Thereafter, Plaintiff requested a hearing before an administrative law judge, and a hearing was held on February 9, 2012. (Tr. at 30-63.) Afterwards, the ALJ issued a decision finding that Plaintiff was not disabled. (Tr. at 9-27.) The Appeals Council denied Plaintiff's request for review, (Tr. at 1-5), making the ALJ's decision the final decision of the Commissioner. This appeal followed.

1

## II.  STANDARD OF REVIEW

2       The Court must affirm the ALJ's findings if the findings are supported by substantial

3 evidence and are free from reversible legal error.  See Reddick v. Chater, 157 F.3d 715, 720

4 (9th Cir. 1998); Marcia v. Sullivan, 900 F.2d 172, 174 (9th Cir. 1990).  Substantial evidence

5 means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might

6 accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401

7 (1971) (citation omitted); see Reddick, 157 F.3d at 720.

8       In determining whether substantial evidence supports a decision, the Court considers

9 the administrative record as a whole, weighing both the evidence that supports and the

10 evidence that detracts from the ALJ's conclusion.  See Reddick, 157 F.3d at 720.  "The ALJ

11 is responsible for determining credibility, resolving conflicts in medical testimony, and for

12 resolving ambiguities."  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995); see

13 Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989).  "If the evidence can reasonably

14 support either affirming or reversing the [Commissioner's] conclusion, the court may not

15 substitute its judgment for that of the [Commissioner]."  Reddick, 157 F.3d at 720-21.

16

## III.  THE ALJ'S FINDINGS

17       In order to be eligible for disability or social security benefits, a claimant must

18 demonstrate an "inability to engage in any substantial gainful activity by reason of any

19 medically determinable physical or mental impairment which can be expected to result in

20 death or which has lasted or can be expected to last for a continuous period of not less than

21 12 months."  42 U.S.C. § 423(d)(1)(A).  An ALJ determines a claimant's eligibility for

22 benefits by following a five-step sequential evaluation:

23      (1)  determine whether the applicant is engaged in "substantial gainful activity";

24      (2)  determine whether the applicant has a medically severe impairment or
combination of impairments;

25

26      (3)  determine whether the applicant's impairment equals one of a number of listed
impairments that the Commissioner acknowledges as so severe as to preclude the
applicant from engaging in substantial gainful activity;

27

28

1

2

(4) if the applicant's impairment does not equal one of the listed impairments, determine whether the applicant is capable of performing his or her past relevant work;

3

4

(5) if the applicant is not capable of performing his or her past relevant work, determine whether the applicant is able to perform other work in the national economy in view of his age, education, and work experience.

5 See Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (citing 20 C.F.R. §§ 404.1520,

6 416.920).  At the fifth stage, the burden of proof shifts to the Commissioner to show that the

7 claimant can perform other substantial gainful work.  See Penny v. Sullivan, 2 F.3d 953, 956

8 (9th Cir. 1993).  The Commission must consider claimant's residual functional capacity and

9 vocational factors such as age, education, and past work experience.  Id.

10    At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful

11 activity since February 20, 2009 – the alleged onset date.  (Tr. at 14.)  At step two, she found

12 that Plaintiff had the following severe impairments: Obesity (5'3" x 170 pounds), status post

13 cervical spine fusion, lumbar spine degenerative disc disease with mild stenosis, a depressive

14 disorder, and headaches.  (Id.)  The ALJ found that there was no objective medical evidence

15 on record of Plaintiff having a bone marrow diagnosis or any evidence to conclude that this

16 is a condition likely to even last 12 months or cause even minimal limitations on Plaintiff's

17 functioning.  (Id.)

18    At step three, the ALJ stated that Plaintiff did not have an impairment or combination

19 of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404,

20 Subpart P, Appendix 1 of the Commissioner's regulations.  (Tr. at 14.)  After consideration

21 of the entire record, the ALJ found that Plaintiff -

22

23

24

25

26

27

has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b), with lifting and carrying to 20 pounds occasionally and 10 pounds frequently, sitting, standing and walking to 6 out of 8 hours per day, no climbing ladders, ropes or scaffolds, occasional climbing ramps and stairs, frequent balancing, crouching, crawling, kneeling and stooping, the need to avoid all exposure to hazardous heights and use of moving machinery, with the mental capacity to perform simple, routine and repetitive tasks, but without specification as to the number of steps required to complete the task, only occasional interaction with the public, coworkers and supervisors.

(Tr. at 16.)

28

The ALJ determined that Plaintiff was unable to perform any past relevant work, as her past work as a caregiver was medium and semi skilled. (Tr. at 21.) The ALJ determined that, "considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." (Tr. at 22.)

Therefore, the ALJ concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, from February 20, 2009, through the date of her decision. (Tr. at 134.)

## IV. DISCUSSION

In her brief, Plaintiff contends that the ALJ erred by: (1) erroneously rejecting treating physician opinions, (2) misstating evidence to the detriment of Plaintiff, and (3) improperly discrediting Plaintiff's testimony. (Doc. 18.) Plaintiff requests that the Court remand for determination of benefits.

**A.    Medical Source Opinion Evidence**

Plaintiff contends that the ALJ erred by failing to properly weigh medical source opinion evidence. Specifically, Plaintiff argues that the ALJ erred by rejecting Plaintiff's treating physicians Drs. Duncan and Smith, and giving "considerable weight" to the single opinion of the "State agent," Dr. Young. (Doc. 18, at 1-4.)

"The ALJ is responsible for resolving conflicts in the medical record." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008). Such conflicts may arise between a treating physician's medical opinion and other evidence in the claimant's record. In weighing medical source opinions in Social Security cases, the Ninth Circuit distinguishes among three types of physicians: (1) treating physicians, who actually treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant. See Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). A treating physician's opinion is entitled to "substantial weight." Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1228 (9th Cir. 2009) (quoting Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988)). A treating physician's opinion is given

controlling weight when it is "well-supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(d)(2). On the other hand, if a treating physician's opinion "is not well-supported" or "is inconsistent with other substantial evidence in the record," then it should not be given controlling weight. Orn v. Astrue, 495 F.3d 624, 631 (9th Cir. 2007) (citation omitted).

If a treating physician's opinion is not contradicted by the opinion of another physician, then the ALJ may discount the treating physician's opinion only for "clear and convincing" reasons. See Carmickle, 533 F.3d at 1164 (quoting Lester, 81 F.3d at 830-31). If a treating physician's opinion is contradicted by another physician's opinion, then the ALJ may reject the treating physician's opinion if there are "specific and legitimate reasons that are supported by substantial evidence in the record." Id. (quoting Lester, 81 F.3d at 830).

Since the opinions of Drs. Duncan and Smith were contradicted by the examining and reviewing doctors' opinions, as well as other objective medical evidence, the specific and legitimate standard applies.

Historically, the courts have recognized the following as specific, legitimate reasons for disregarding a treating or examining physician's opinion: conflicting medical evidence; the absence of regular medical treatment during the alleged period of disability; the lack of medical support for doctors' reports based substantially on a claimant's subjective complaints of pain; and medical opinions that are brief, conclusory, and inadequately supported by medical evidence. See, e.g., Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005); Flaten v. Secretary of Health and Human Servs., 44 F.3d 1453, 1463-64 (9th Cir. 1995); Fair v. Bowen, 885 F.2d 597, 604 (9th Cir. 1989).

Plaintiff began seeing Dr. Duncan as early as November, 2008, and had been treated by Dr. Duncan for migraines since 2002. (Tr. at 268-69, 332.) In January, 2009, Dr. Duncan reported that Plaintiff complained of neck and back pain, and that her pain had been particularly worse over the last few months. (Tr. at 262.) Dr. Duncan reported that Plaintiff's "[s]traight leg raising" is negative bilateral," and her knees and ankle strength is

1   "equal and strong bilaterally."  (Id.)  A cervical spine examination indicated degenerative

2   changes in the mid cervical spine.  (Tr. at 275.)  An MRI revealed mild to moderate stenosis,

3   present in C5-5 and C5-6 disc spaces, and a left foraminal disc protrusion at C5-6.  (Tr. at

4   270.)   A complete thoracic spine series revealed, on February 10, 2009, mild thoracic

5   scoliosis and degenerative changes.  (Tr. at 272.)

6          Dr. Duncan saw Plaintiff in a follow-up visit on February 20, 2009, and noted that

7   Plaintiff's CT scan and x-ray revealed severe left foraminal stenosis at C5/6, the area of

8   Plaintiff's most significant symptoms, and that she would be seeing a neurosurgeon in April

9   and getting a nerve condition study done.  (Tr. at 261.)  In March, 2009, Dr. Duncan saw

10  Plaintiff for a "follow-up" for her anxiety, and noted that Plaintiff was taking Xanax and had

11  started exercising recently, which had "helped her tremendously."  (Tr. at 260.)  Dr. Duncan

12  recommended that Plaintiff continue her exercise, noting that it "might resolve all together

13  as long as she continues on her exercise program."  (Id.)  In May, 2009, Dr. Duncan saw

14  Plaintiff for a follow-up, and reported that Plaintiff continues to have her pain in her neck

15  which goes down into her left shoulder and arm.  (Tr. at 259.)

16         Plaintiff reported to Dr. Duncan during a visit on October 9, 2009, that she was

17  experiencing pain in her back that goes down her leg and causes her leg and foot to go numb

18  on the right side.  (Tr. at 347.)  Dr. Duncan noted that Plaintiff was palpably tender in the

19  spine, but that reflexes were intact, and strength was equal and strong bilaterally.  (Id.)  A

20  thoracic spine series found "very minimal spondylosis deformans [and] otherwise

21  unremarkable x-rays of the thoracic and lumbar spine for age," and a "small left parasagittal

22  disc herniation at the T9-10 level, which exerts minimal mass effect upon the interior aspect

23  of the thoracic spinal cord."  (Tr. at 366-67.)  Dr. Duncan reported on November 18, 2009,

24  that Plaintiff was on Soma at night and Hydrocodone during the daytime, and takes about six

25  pain pills a day.  (Tr. at 246.)

26         On January 28, 2010, Dr. Duncan completed a headache questionnaire, and described

27  Plaintiff's headaches as on averages "2-3 per month," and 3-days in duration.  (Tr. at 332.)

28  Dr. Duncan opined that the effect of Plaintiff's headaches would result in an average of 12-

1   14 absences from work per month.  (Id.)  In a residual functional capacity questionnaire, Dr.

2   Duncan reported as extreme Plaintiff's limitations on ability to make judgments on simple

3   work-related decisions, to understand and remember detailed instructions, interact

4   appropriately with the public, supervisors or co-workers, respond appropriately to work

5   pressures in a usual work setting, and to changes in a routine work setting.  (Tr. at 333-34.)

6   In support of his assessment, Dr. Duncan stated that Plaintiff "has classic symtomatology of

7   migraine, imaging studies have been negative which would be expected.  Reacted to typical

8   migraine medications w/arterial constriction [and] chest pain.  Managed suboptimally [with]

9   narcotics."  (Id.)  Nerve Conduction Study ordered by Dr. Duncan was determined to be

10  normal on February 24, 2009, although there were some signs reported of denervation of the

11  paraspinal muscles.  (Tr. at 256.)

12          In a follow-up visit on March 19, 2010, Plaintiff reported having pain in her shoulder

13  and down the arm on the left side and some sensory deprivation of her left upper extremity.

14  (Tr. at 344.)  In a well-woman examination on March 23, 2009, Plaintiff denied any current

15  migraine headaches.  (Tr. at 343.)  An MRI of the Plaintiff's brain on April 5, 2010, did not

16  reveal any masses or acute findings.  (Tr. at 364.)  On October 27, 2010, Plaintiff visited Dr.

17  Duncan after having re-injured her neck a few weeks before.  (Tr. at 339.)  Plaintiff reported

18  that she was "doing well" until a couple of weeks ago when she was "riding on her quad and

19  a dog ran out in front of her and she had to change directions very quickly" and she

20  "wrenched her neck."  (Id.)  Plaintiff reported increasing pain in her neck and increasing

21  weakness of her left upper extremity since her surgery (spinal fusion) in August, 2010.  (Id.)

22   A follow-up x-ray and MRI of the cervical spine indicated that the C4-5 and C5-6 appeared

23  normal.  (Tr. at 356, 358.)

24          On January 25, 2011, Plaintiff returned to Dr. Duncan for a follow-up, and reported

25  continuing radiculopathy in her left upper extremity with numbness and weakness and pain

26  in her neck and shoulder.  (Tr. at 337.)  Dr. Duncan noted that, other than the surgical fusion

27  of the discs, her cervical spine was normal.  (Id.)  Dr. Duncan suggests also that Plaintiff

28  "apply for social security disability," and states that "we will try to help her in any way

1   possible." (Tr. at 337.)  Plaintiff continued to report pain symptom to Dr. Duncan during

2   follow-up appointments on December 23, 2010, and May 10 and 19, 2011. (Tr. at 335, 336-

3   38.) Dr. Duncan reported on May 19, 2011 that Plaintiff has "profound physical limitations

4   and moderate to severe psychiatric impairment as well." (Tr. at 335.)

5          Dr. Duncan completed a headache questionnaire and medical assessment of ability to

6   do work related activities on May 19, 2011. (Tr.at 369-72.) Dr. Duncan reported that in an

7   8-hour work day, Plaintiff can sit a total of 4 hours, and stand/walk a total of 2 hours, but that

8   Plaintiff could stand/walk for a single period of 10 minutes at a time. (Id.) Dr. Duncan

9   reported that Plaintiff can only lift or carry up to 5 pounds occasionally, never stoop or squat,

10  occasionally crawl, climb or reach, never or only occasionally use her left hands for simple

11  grasping, pushing/pulling or fine manipulation, never use her feet for repetitive movements.

12  (Id.) Dr. Duncan found that Plaintiff should be totally restricted from unprotected heights,

13  being around moving machinery, and driving automobile equipment, and should be

14  moderately restricted from exposure to dust, fumes, gasses, and marked changes in

15  temperature or humidity. (Id.) Dr. Duncan additionally limited Plaintiff's activities due to

16  her pain and fatigue, which he rated as moderately severe. (Id.)  In the headache

17  questionnaire, Dr. Duncan reported that Plaintiff's migraines occurred two times weekly,

18  with a pain level of 7 to 8 out of 10, and that the headaches affect Plaintiff's concentration,

19  attention, memory and capacity to work, and that, in his opinion, the effect of Plaintiff's

20  headaches would result in her missing an average of more than 6 days of work per month.

21  (Id.)

22         Plaintiff sought chiropractic treatment on six occasions in March, 2010, for arm

23  numbness/pain, headaches, low back pain, vertigo and neck pain. (Tr. at 373-80.) During

24  her last visit, Bruce Weary, D.O., reported that Plaintiff appeared to be 40% improved, but

25  that she reported a worsening of her neck pain. (Tr. at 373.)

26         In December, 2011, Plaintiff was seen by Dr. Barranco at Barrow Neurological

27  Associates, post-op (spinal fusion surgery in August, 2010). (Tr. at 381-89.) Dr. Barranco

28  reported that Plaintiff advised that she was "doing extremely well," and had no further pain

in her arms and neck.  (Id.)  Dr. Barranco noted that Plaintiff appeared healthy, alert and in no acute distress, and was walking normal.  (Id.)  Plaintiff's motor strength in her upper extremities was described as 5 out of 5, except for her left deltoid, which was described as 4 out of 5.  (Id.)  Dr. Barranco also noted that Plaintiff was not having any significant neck pain or headaches.  (Id.)  In reviewing Plaintiff's MRI, Dr. Barranco found that Plaintiff had "some minor age compatible degenerative changes" in her cervical spine, but "no significant structural or mechanical cervical spine pathology."  (Tr. at 405.)

Plaintiff moved to Montana and began seeing Donna Smith, D.O., at Northwest CHC in August, 2011.  (Tr. at 427.)  Dr. Smith assessed Plaintiff with tobacco use disorder, hypothyroidism, and myeloradiculitis.  (Tr. at 428.)  On August 15, 2011, Plaintiff saw Dr. Hall, MD, at Northwest CHC, and reported significant increase in lower back pain since she stopped taking oxycontin 5 days before.  (Tr. at 424.)  On August 17, 2011, an MRI of Plaintiff's lumber spine was performed to assess Plaintiff's symptoms of lower back pain and numbness with weakness in her legs, and revealed that Plaintiff had mild stenosis at L4-5, with borderline narrowing of the left lateral recess due to a combination of spondylosis and a posterior central disc protrusion which showed mild interior extrusion of disc, and mild fatty canal stenosis at L5-S1.  (Tr. at 432.)

On August 18, 2011, Plaintiff saw Dr. Smith and reported that her chronic back pain was worsening, and reported left side seat and leg numbness, and increasing left leg weakness.  (Tr. at 421.)  Dr. Smith opined that Plaintiff was limited to lifting 5 pounds.  (Tr. at 422.)  On September 22, 2011, Dr. Smith reported that neurologically Plaintiff's gait was coordinated and even, although she maneuvered the exam table with difficulty, that her distal strength and sensation were largely intact.  (Tr. at 418.)  On October 10, 2011, Plaintiff reported to Dr. Smith that  she hadn't had any depression episodes lately and had weaned herself off of Prozac.  (Tr. at 414.)  Plaintiff also reported that she still had pain on a daily basis but that it did not impair her ability to function.  (Id.)  Dr. Smith indicated that Plaintiff did not have dizziness or headaches.  (Tr. at 415.)

1        On March 10, 2012, Dr. Smith completed a medical assessment of Plaintiff's ability

2   to do work-related activities. (Tr. at 451-53.) Dr. Smith reported that in an 8 hour work day,

3   Plaintiff can sit and stand/walk, respectively, for a total of less than one hour per day. (Id.)

4   Dr. Smith opined that Plaintiff could lift up to 5 pounds frequently, and 6-20 pounds

5   occasionally, that she can carry up to 10 pounds occasionally, and that she can occasionally

6   stoop, squat, crawl and reach. (Id.) Dr. Smith also indicated that Plaintiff can use her hands

7   frequently for simple grasping, and pushing/pulling of controls, but only occasionally for fine

8   manipulation. (Id.) Dr. Smith opined that Plaintiff can use both feet for repetitive

9   movements, and is totally restricted in activities involving unprotected heights, being around

10  moving machinery, exposure to dust, fumes, gases, and moderately restricted in activities

11  involving driving automobile equipment and exposure to marked changes in temperature or

12  humidity. (Id.) Dr. Smith rated Plaintiff's complaints of pain and fatigue as affecting her

13  ability to function as moderately severe. (Id.)

14       Ken Young, D.O., from the state agency examined Plaintiff on November 3, 2009.

15  (Tr. at 276.) Plaintiff's chief complaint to Dr. Young was pain involving her entire back, but

16  especially her cervical region and thoracic and lumbar area. (Id.) Plaintiff reported that she

17  was able to do the "light stuff" of daily living, but that her daughter had to help her with the

18  heavy stuff, such as lifting or sweeping. (Id.) Dr. Young reported that Plaintiff was able to

19  walk to the examination room without assistance, could sit comfortably, get off the exam

20  table, and take her shoes off and put them back on. (Tr. at 277.) He noted her gait was stiff

21  and almost spastic like. (Id.) Plaintiff could squat, but Dr. Young noted that there was

22  definitely imbalance and vertiginous behavior. (Tr. at 278.) Dr. Young noted that Plaintiff

23  did not use, and did not need an assistive device. (Id.) Dr. Young noted no weakness in

24  motor strength. (Id.) In his functional assessment, Dr. Young felt that Plaintiff's conditions

25  would impose limitations for 12 continuous months, but that she could stand/walk and sit for

26  6-8 hours, respectively, in a work day. (Tr. at 279.) Dr. Young opined that Plaintiff could

27  lift up to 20 pounds occasionally and 10 pounds frequently, that Plaintiff was unlimited in

28  her seeing, hearing and speaking capacity, and unrestricted in the activities of climbing,

1   stooping, kneeling, crouching, crawling, reaching, handling, fingering and feeling. (Tr. at
2   280.) Dr. Young found that Plaintiff should be restricted from working around heights and
3   moving machinery, mainly because of Plaintiff's imbalance and possible vertiginous
4   behavior. (Tr. at 281.)  Radiological examination of Plaintiff's cervical spine took place on
5   November 3, 2009, with the radiologist finding mild degenerative spondylosis of the cervical
6   spine, and less than 5% levoscoliosis of the thoracic spine.    (Tr. at 282-83.)

7         On December 3, 2009, psychologist Stephen Gill, Ph.D., examined Plaintiff at the
8   request of the state agency, and noted that, although Plaintiff reported depression and chronic
9   back pain, she reported being able to care for herself, cook, do light housework, go on
10  errands and shop, pay bills and handle money, drive her car, follow simple questions and
11  instructions, and read and write simple sentences.  (Tr. at 286-87.)  Dr. Gill diagnosed
12  Plaintiff as having depressive disorder, secondary to her degenerative disc disease, NOS.
13  (Tr. at 287.)  He opined that Plaintiff has the ability to avoid hazards and exercise a degree
14  of social judgment, has limited skill in interacting with others, has distractions before her
15  which in certain instances interfere with her ability to concentrate, but that, in consideration
16  of her back pain, Plaintiff is able to learn a simple repetitive task and apply that task in an
17  appropriate set of circumstances.  (Tr. at 288.)

18        In Plaintiff's activities of daily living, she reported being independent in self care,
19  does some cooking and some light household chores, and in social functioning, she reported
20  getting along well with family members and medical personnel, and picks up her grandson
21  from school. (Tr. at 224-231.)  Plaintiff manages her own finances, does some shopping, can
22  sometimes drive, reads, and writes in a journal.  (Id.)  At her hearing, Plaintiff testified that
23  she is no longer driving due to her neck pain and left arm pain and weakness, and although
24  she benefitted from neck surgery, she re-injured her neck riding an all-terrain vehicle.  (Tr.
25  at 38-40.)  Plaintiff testified that, even with medication, she experiences 6/10 low back pain,
26  5/10 hip pain, and 6/10 knee pain, and that she experiences medication side effects including
27  poor memory, fatigue and nausea.  (Tr. at 47-49.)  Plaintiff also testified that she had not
28  been taking any medications for depression or anxiety for about six or seven months, but that

1  she intended to start mental health treatment eventually.  (Tr. at 42-43.)  She also testified

2  that her doctor had limited her to lifting 5 pounds or less.  (Id.)

3      The state agency reviewing physicians, Jonathan Zuess, MD, and Kathleen Handal,

4  MD, completed their review on December 8, 2009.  Dr. Zuess, a psychiatrist, noted Plaintiff

5  suffers from depressive disorder, NOS, and opined that she had mild limitation on restriction

6  of activities of daily living, difficulties in maintaining social functioning, and difficulties in

7  maintaining concentration, persistence or pace.  (Tr. at 302.)  In Dr. Zuess's mental residual

8  functional capacity assessment, he noted that Plaintiff was moderately limited in her ability

9  to remember locations and work-like procedures, in her ability to carry out detailed

10  instruction, in her ability to maintain attention and concentration for extended periods, in her

11  ability to complete a normal weekday and workweek without interruptions, and in her ability

12  to interact appropriately with the general public.  (Tr. at 305-06.)

13      Dr. Handal diagnosed Plaintiff with C5-6 disc disorder, with a secondary diagnosis

14  as hypothyroid disorder.  (Tr. at 309.)    She limited Plaintiff to lifting/carrying up to 20

15  pounds occasionally, up to 10 pounds frequently, about 6 hours of standing and/or walking

16  during an 8-hour workday, and about 6 hours of sitting in an 8-hour workday.  (Tr. at 310.)

17  She opined that Plaintiff could only occasionally climb stairs, and never balance.  (Tr. at

18  311.)  Dr. Handal found no manipulative, visual, or communicative limitations, and only

19  avoiding hazards as an environmental limitation.  (Tr. at 313.)

20      In her evaluation of the objective medical evidence, the ALJ first addressed Dr.

21  Duncan's opinion that Plaintiff's pain and headaches prevented her from being able to work,

22  that she would miss over 6 days of work per month as a result of her impairments and

23  associated limitations, would be limited on standing and walking ten minutes at a time for

24  a total of four hours, could never fine manipulate with her left hand, drive, operate

25  machinery, and that she experienced moderately severe pain and fatigue.  (Tr. at 19.)  The

26  ALJ rejected Dr. Duncan's opinion because it was based upon the Plaintiff's subjective

27  complaints, and was not supported by his own objective and clinical or laboratory findings

28  or treatment notes.  (Tr. at 19-20.)  For instance, the ALJ observed that Dr. Duncan's

1   treatment notes do not show that Plaintiff has any restrictions on fine manipulation, and do
2   not provide any explanation for the extreme limits he imposes on Plaintiff's functional
3   capacity.  (Tr. at 20.)  With respect to mental health issues, the ALJ found that, as a primary
4   care physician, Dr. Duncan's opinions in that regard are outside his medical specialty.  The
5   ALJ also noted that Dr. Duncan had expressed a sympathetic opinion on Plaintiff's functional
6   limitations and had indicated that he "[would] help her" with her SSI application process and
7   paperwork.  (Id.)  Dr. Duncan's treatment notes also reflected that he instructed Plaintiff to
8   follow-up as needed and that her condition was stable.  (Id.)

9         The ALJ then rejected the opinion of Dr. Smith in her medical source statement dated
10  March 10, 2012, that Plaintiff could not sustain sedentary work activity, and had moderately
11  severe limitations associated with pain and fatigue, because Dr. Smith had only a short term
12  relationship with Plaintiff (less than 6 months), had based her opinion primarily on Plaintiff's
13  subjective complaints, and her opinion was conclusory with little explanation.  (Tr. at 20.)
14  See, 20 C.F.R. §404.1527(c)(2)(i) (stating than an ALJ should consider whether a treating
15  source has seen a claimant "a number of times and long enough to have obtained a
16  longitudinal picture" of claimant's impairment).

17        The ALJ gave considerable weight to Dr. Young's opinion that Plaintiff could perform
18  a wide range of light work activity with limited exposure to heights and moving machinery,
19  based upon the objective nature of Dr. Young's exam and his consistency with the greater
20  objective record,  however, the ALJ found for additional postural limitations.  (Tr. at 20.)
21  The ALJ noted that Dr. Young had diagnosed pain complaints relating primarily to Plaintiff's
22  spine, with some minor loss of range of motion and some imbalance and vertiginous
23  behavior, and found that Plaintiff's gait was stiff and almost spastic.  (Id.)  The AlJ also
24  observed that Dr. Young found that Plaintiff could squat, that her motor was 5/5 throughout,
25  with no atrophy, weakness, that her cervical spine range of motion was decreased by 2-5
26  degrees in cervical rotation and lateral side mainly to the left, and that her paravertebral spine
27  exhibited general absence of muscle spasm, tenderness, crepitus, effusions or trigger points
28  noted.  (Id.)

1   The ALJ gave greater weight to the opinion of Dr. Gill that Plaintiff retained the
2   mental capacity for simple, unskilled work, based on the objective nature of his evaluation
3   and his consistency with the greater objective record.  (Tr. at 21.)  The ALJ stated that the
4   treatment notes of record failed to controvert the assertion that Plaintiff can perform simply,
5   unskilled, repetitive tasks.  (Id.)

6   The ALJ considered the opinions of the state agency's reviewing physicians regarding
7   Plaintiff's residual functional capacity and gave them greater weight because their opinions
8   were not inconsistent with the greater objective record, particularly regarding their finding
9   that Plaintiff could perform a wide range of light work activity with some postural and
10  environmental limitations, no more than mild to moderate mental limitations, with the ability
11  to perform simple, unskilled work with limited social contact in the workplace.

12  The Court finds that the ALJ properly weighed the medical source opinion evidence,
13  and gave specific and legitimate reasons, based on substantial evidence in the record, for
14  discounting the physicians and evidence which Plaintiff relies upon in her brief.  The ALJ
15  discredited the various physicians' assessments due to inconsistencies with Plaintiff's
16  treatment record and the medical evidence as a whole.  The ALJ also found that the opinions
17  were conclusory, lacked supporting clinical findings, and were based on Plaintiff's own
18  subjective complaints.  See, e.g., Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008)
19  (finding the incongruity between doctor's questionnaire responses and her medical records
20  provides a specific and legitimate reason for rejecting the opinion); Connett v. Barnhart, 340
21  F.3d 871, 875 (9th Cir. 2003) ("We hold that the ALJ properly found that [the physician's]
22  extensive conclusions regarding [the claimant's] limitations are not supported by his own
23  treatment notes.  Nowhere do his notes indicate reasons why [the physician would limit the
24  claimant to a particular level of exertion]."); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th
25  Cir. 2001) (holding that the ALJ properly rejected a physician's testimony because "it was
26  unsupported by rationale or treatment notes, and offered no objective medical findings to
27  support the existence of [the claimant's] alleged conditions"); Morgan v. Comm'r Soc. Sec.
28  Admin., 169 F.3d 595, 602 (9th Cir. 1999) (citing Fair, 885 F.2d at 605) (An ALJ may reject

1  a treating physician's opinion if it is based "to a large extent" on a claimant's self-reports that

2  have been properly discounted as incredible.)  Therefore, the Court finds no error.

3  **B.      The ALJ's Development of the Record**

4          Plaintiff argues that the ALJ erred by discounting Plaintiff's assertion of a 5-pound

5  limitation in her lifting ability, finding no objective evidence of a bone marrow disorder, and

6  by not reading or reviewing the medical records of Drs. Duncan and Smith.  (Doc. 18, at 10.)

7  The ALJ has a "duty to fully and fairly develop the record and to assure that the claimant's

8  interests are considered."  <u>Tonapetyan</u>, 242 F.3d at 1150 (citing <u>Smolen v. Chater</u>, 80 F.3d

9  1273, 1288 (9th Cir. 1996)).  However, "an ALJ's duty to develop the record further is

10  triggered only when there is ambiguous evidence or when the record is inadequate for proper

11  evaluation of evidence."   <u>Mayes v. Massanari</u>, 276 F.3d 453, 459-60 (9th Cir. 2001).

12  Ultimately, it is the plaintiff's burden to prove that he or she is disabled.  <u>See</u> <u>id.</u> at 459

13  (citing 42 U.S.C. § 423(d)(5) (Supp. 2001)).

14          Although Plaintiff asserted a 5-pound limitation, Dr. Smith had opined in March,

15  2012, that Plaintiff could occasionally lift up to 20 pounds.  (Tr. at 451.)  In addition, in a

16  follow-up appointment at Barrow Neurological Associates in December, 2011, after her

17  spinal fusion surgery, Dr. Barranco reported that Plaintiff reported she was doing extremely

18  well and had no further pain in her arms and neck, and assessed her motor strength in her

19  upper extremities as 5 out of 5, except for Plaintiff's left deltoid, which Dr. Barranco

20  described as 4 out of 5.  Thus, objective medical evidence supported the ALJ's discounting

21  of Plaintiff's reported limitation.

22          The ALJ also did not err in finding that the objective record did not support a finding

23  that Plaintiff suffered from a bone marrow disorder.  Plaintiff asserts that Dr. Smith's notes

24  reflected Plaintiff's prior exposure to copper mines and nuclear testing.  Although this noted

25  exposure is arguably insufficient to support a medical finding of bone marrow disorder, in

26  the end there was simply no evidence that, even if Plaintiff suffered from a bone marrow

27  disorder, that the condition was likely to last 12 months, or cause minimal functioning.  The

28  ALJ did not therefore err in concluding that Plaintiff did not have the severe impairment of

bone marrow disorder.  Plaintiff also complaints that the ALJ failed to recognize her "C6 denervation."  (Doc. 18, at 10.)  In fact, the ALJ found that Plaintiff had the severe impairment of post cervical spine fusion, lumbar spine degenerative disc disease with mild stenosis, and referenced extensively the medical findings relating to her reported neck and back pain.  (Tr. at 17-18.)  It is also evident by the ALJ's written analysis of the medical records of Plaintiff's treating physicians, that she reviewed the records of Drs. Duncan and Smith.  Thus, the ALJ did not err by failing to consider the medical objective evidence relating to the condition of her spine.

**C.    Plaintiff's Subjective Complaints**

Plaintiff argues that the ALJ erred in rejecting her subjective complaints in the absence of clear and convincing reasons for doing so.

If there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so."  Lingenfelter v. Astrue, 504 F.3d 1028, 1036-37 (9th Cir. 2007) (citations omitted). The ALJ must identify "what testimony is not credible and what evidence undermines the claimant's complaints."  See Parra v. Astrue, 481 F.3d 742, 750 (9th Cir. 2007) (quoting Lester, 81 F.3d at 834).

In weighing a claimant's credibility, the ALJ may consider many factors, including, "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities."  Smolen, 80 F.3d at 1284; see Orn, 495 F.3d at 637-39.[1]  The ALJ also considers

---

[1] With respect to the claimant's daily activities, the ALJ may reject a claimant's symptom testimony if the claimant is able to spend a substantial part of her day performing household chores or other activities that are transferable to a work setting. See Fair, 885 F.2d at 603. The Social Security Act, however, does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take

1   "the claimant's work record and observations of treating and examining physicians and other

2   third parties regarding, among other matters, the nature, onset, duration, and frequency of the

3   claimant's symptom; precipitating and aggravating factors; [and] functional restrictions

4   caused by the symptoms ... ."  Smolen, 80 F.3d at 1284 (citation omitted).

5          Plaintiff was represented by counsel at the 2012 administrative hearing.  (Tr. at 12.)

6   She testified that she is not driving due to neck pain and left arm pain and weakness.  (Tr. at

7   17.)  She reported benefitting from neck surgery, but said that she re-injured her neck riding

8   an off-road all-terrain vehicle, and that, even with medication, she experiences 6/10 low back

9   pain, 5/10 hip pain, and 6/10 knee pain.  Plaintiff testified that she experiences medication

10  side effects, to include poor memory, fatigue and nausea.  (Id.)

11         With respect to daily living activities, the ALJ noted that Plaintiff has mild restriction,

12  is independent in self care, cooks, does household chores and watches her grandson.  (Tr. at

13  15.)  She reported mild difficulties with social functioning, gets along well with family

14  members and medical personnel, picks up her grandson from school, and is married.  (Id.)

15  With respect to concentration, the ALJ noted that Plaintiff reported moderate difficulties, has

16  some limitations due to pain, but managers her own finances, shops, drives, reads, works on

17  word puzzles and keeps a journal.  (Id.)

18         The ALJ concluded that "[Plaintiff]'s statements concerning the intensity, persistence

19  and limiting effects of these symptoms are not credible to the extent they are inconsistent

20  with the [] residual functional capacity assessment."  (Tr. at 132.)  As the ALJ did not find

21  evidence of malingering, she can reject the plaintiff's testimony about the severity of her

22  symptoms only by offering specific, clear and convincing reasons for doing so.   Having

23  reviewed the record, the Court finds that the ALJ identified several clear and convincing

24  reasons supported by the record for discounting Plaintiff's statements regarding her

25  limitations.  In recounting what Plaintiff reported in her daily living activities and in her

26  testimony, the ALJ noted that, although Plaintiff claimed to have difficulty remembering

27

28  medication.  See id.

1    spoken instructions, her daily activities indicate that she is able to remember and perform

2    simple tasks on a regular basis.  (Tr. at 17.)

3         The ALJ found that the objective record did not support the alleged frequency nor

4    severity of Plaintiff's migraines, as Dr. Duncan's progress notes indicated that Plaintiff was

5    inconsistent in her reporting and at times denied current headaches, and noted fewer

6    headaches per month than Plaintiff asserted.  (Tr. at 17.)  The ALJ also noted that Plaintiff

7    did not report headaches to the consultive examiners, and that a magnetic resonance imaging

8    scan (MRI), performed in 2011, showed no abnormalities.  (Id.)

9         The ALJ found that Plaintiff's complaints of chronic and disabling neck pain were not

10   supported by the objective record, noting that a 2009 cervical spine MRI revealed

11   degenerative changes with the most severe being left foraminal disc protrusion at C5-6, a

12   2009 nerve conduction study revealed predominantly normal findings, and 2009 spinal x-rays

13   showed less than 5% levoscoliosis of the thoracic spine and mild degenerative spondylosis

14   of the cervical spine.  (Tr. at 18.)  The ALJ stated that, thereafter, Plaintiff underwent

15   cervical decompression, fusion and plating at C4-5 and C5-6 in July 2010.  (Id.)  The ALJ

16   noted that Plaintiff did well postoperatively through October, 2010, and then reported a

17   return of neck pain.  (Id.)  The ALJ notes that subsequent MRI findings and neurological

18   findings are not consistent with Plaintiff's allegations of extreme pain and limitations.  (Tr.

19   at 18.)

20        With respect to Plaintiff's complaints of debilitating back pain, the ALJ found that the

21   objective and clinical findings do not show any significant nerve root compression, noting

22   that an August, 2011, lumbar spine MRI showed mild stenosis, and that Plaintiff had reported

23   on October 20, 2011, that her pain did not impair her ability to function.  (Tr. at 18.)  The

24   ALJ found that, given Plaintiff's history of cervical fusion, cervical degenerative disc disease

25   and lumbar degenerative disc disease, she would be unable to lift and carry heavy weights,

26   but that this limitation was accommodated by the residual functional capacity.  (Id.)

27        The ALJ also found that Plaintiff's reported medication side effects were not

28   supported by progress records and clinical laboratory findings.  (Tr. at 18.)  The ALJ noted

1  several other inconsistencies in the record, - Plaintiff testified her left hand was weak and had

2  atrophied, which the objective medical evidence did not support - Plaintiff's alleged

3  difficulties in fingering, handling or gripping were not demonstrated and inconsistent with

4  recent neurological examination showing a 4/5 muscle strength in the left upper extremity -

5  Plaintiff's gait is often described as coordinated, evan and normal, and, - the medical records

6  fail to demonstrate that Plaintiff's use of a cane is medically necessary.  (Id.)

7         Turning to Plaintiff's mental health, the ALJ noted that her treatment had been

8  infrequent with no history of psychiatric hospitalization, and that mental health progress

9  notes from May 2010 revealed that Plaintiff's mood was improved and that she was feeling

10  better, and that Plaintiff reported to her physician in October, 2011, that she had completely

11  weaned herself off of her depression medication. (Tr.at 19.)  Also, Plaintiff had not resumed

12  her mental health treatment since her relocation to Montana. (Id.)  The ALJ found that these

13  factors undermine the alleged severity of Plaintiff's mental health impairments.  (Id.)

14         The ALJ also noted that Plaintiff had not cooperated fully in the development of her

15  claim, as her attorney had cancelled a scheduled consultative examination on April 14, 2010,

16  and did not provide a regulatory basis for refusal to attend the exam. (Tr. at 19.)  The ALJ

17  stated that this did not bolster Plaintiff's credibility, because it demonstrates a lack of

18  cooperation in the development of her claim, and that Plaintiff ultimately bears the burden

19  of showing she is disabled. (Id.)  Plaintiff argues that the ALJ's consideration of her lack of

20  cooperation in attending a consultative examination was not proper, as her attorney had

21  articulated reasons for cancelling the examination, and because Plaintiff did attend

22  consultative examinations on November 11 and 13, 2009. (Doc. 18, at 14.)  A claimant's

23  lack of cooperation in consultive examinations may be considered by an ALJ in assessing

24  credibility. See, Tonapetyan v. Halter, 242 F.3d 1148 (9th Cir. 2001).  Even if the ALJ had

25  improperly considered Plaintiff's lack of cooperation, as argued by Plaintiff, that error is

26  harmless, as the ALJ cited numerous other specific and cogent reasons for her adverse

27  credibility determination, and there was substantial evidence supporting her conclusion. See,

28  Carmickle v. Comm'r Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008) (ALJ's reliance

on two invalid reasons in making adverse credibility determination subject to harmless error analysis).

In summary, the Court finds that the ALJ provided a sufficient basis to find Plaintiff's allegations not entirely credible.  While perhaps the individual factors, viewed in isolation, are not sufficient to uphold the ALJ's decision to discredit Plaintiff's allegations, each factor is relevant to the ALJ's overall analysis, and it was the cumulative effect of all the factors that led to the ALJ's decision.  The Court concludes that the ALJ has supported her decision to discredit Plaintiff's allegations with specific, clear and convincing reasons and, therefore, the Court finds no error.

**D.      Conclusion**

Substantial evidence supports the ALJ's decision to deny Plaintiff's claim for disability insurance benefits in this case.  Consequently, the ALJ's decision is affirmed.

Based upon the foregoing discussion,

**IT IS ORDERED** that the decision of the ALJ and the Commissioner of Social Security be affirmed;

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment accordingly.  The judgment will serve as the mandate of this Court.

DATED this 10th day of September, 2014.

Michelle H. Burns
United States Magistrate Judge